UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TYRONE ARDELL PUGH, JR.,

        Petitioner,

                                  Case No. 04-CV-71231-DT

v.

                                  Paul D. Borman

DOUGLAS C. VASBINDER,        United States District Judge

        Respondent.
_____/

**OPINION AND ORDER DENYING HABEAS CORPUS PETITION
AND DECLINING TO ISSUE A CERTIFICATE OF APPEALABILITY**

      Petitioner Tyrone Ardell Pugh, Jr., has filed a *pro se* application for the writ of habeas corpus pursuant to 28 U.S.C. § 2254. The habeas petition attacks Petitioner's state conviction for first-degree criminal sexual conduct. The Court has concluded for the following reasons that the petition must be denied.

**I. Background**

    **A. State Court Proceedings**

      On September 14, 2001, Petitioner pleaded no contest in Genesee County, Michigan to one count of first-degree criminal sexual conduct. *See* MICH. COMP. LAWS § 750.520b(1)(f) (sexual penetration using force or coercion and resulting in injury to the victim). In return, the prosecutor dismissed a second count of first-degree criminal sexual conduct. The prosecutor also agreed not to seek an enhanced sentence under the State's habitual offender statute.

      The trial court sentenced Petitioner to imprisonment for a minimum of 285 months and a maximum of 500 months. Petitioner subsequently moved to withdraw his plea or to be re-

sentenced. The trial court held an evidentiary hearing on the motion and denied it.

Petitioner raised two claims in an application for leave to appeal his conviction: (1) he did not knowingly, understandingly, and voluntarily plead no contest; and (2) he was sentenced on the basis of erroneously scored sentencing guidelines in violation of his right to due process. A panel of the Michigan Court of Appeals denied leave to appeal "for lack of merit in the grounds presented." *See People v. Pugh*, No. 247956 (Mich. Ct. App. Aug. 5, 2003).[1] Petitioner raised the same two claims in an application for leave to appeal in the Michigan Supreme Court. On December 30, 2003, the supreme court denied leave to appeal because it was not persuaded to review Petitioner's claims. *See People v. Pugh*, No. 124465 (Mich. Sup. Ct. Dec. 30, 2003).

**B. Federal Court Proceedings**

Petitioner initiated this action by filing a habeas corpus petition on April 2, 2004. The grounds for relief read:

I. Petitioner did not knowingly, understandingly, and voluntarily plead no contest, in violation of the state and federal due process clauses.

II. Petitioner was sentenced on the basis of erroneously scored guidelines, in violation of his right to due process.

On October 12, 2004, Respondent filed a responsive pleading through counsel. He argued that the state court's decision on Petitioner's first claim was not an unreasonable application of Supreme Court decisions and that Petitioner's second claim was not cognizable on habeas review.

On December 7, 2004, Petitioner filed an amended habeas petition, which raised the

---

[1] Presiding Judge Janet T. Nell voted to grant the application for leave to appeal.

same two claims about the voluntariness of his plea and the scoring of the guidelines, plus a third claim alleging ineffective assistance of appellate counsel. Because Petitioner had not exhausted state remedies for his ineffective-assistance-of-counsel claim, the Court ordered him to decide whether he wanted to proceed with his two exhausted claims or to pursue state court remedies for his unexhausted third claim about appellate counsel. Petitioner subsequently informed the Court that he wished to proceed with his first two claims and withdraw his unexhausted third claim.

## II. Standard of Review

Petitioner is entitled to the writ of habeas corpus only if he can show that the state court's adjudication of his claims on the merits–

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A state court's decision is an "unreasonable application of" clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "Avoiding these pitfalls does not require citation of [Supreme Court] cases – indeed, it does not even

3

require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam* opinion) (emphasis in original).

> Furthermore, state findings of fact are presumed to be correct unless the defendant can rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Finally, review is conducted in light of the law as it existed at the time of the final state court decision, *Teague v. Lane,* 489 U.S. 288 (1989), unless an intervening constitutional decision announces a 'watershed' rule of criminal law with implications for the fundamental fairness of the trial proceeding. *Caspari v. Bohlen,* 510 U.S. 383, 396 (1994).

*Baze v. Parker*, 371 F.3d 310, 318 (6th Cir. 2004).

### III. Discussion

#### A. Whether the Plea Was Voluntary and Intelligent

The first habeas claim alleges that Petitioner did not knowingly, understandingly, and voluntarily plead no contest. Petitioner, who has been deaf since birth, alleges that he was confused and uncertain about the consequences of his plea and about the meaning of a no contest plea. According to him, he did not understand that a conviction would follow automatically from his plea, and, after listening to the trial judge, he thought he would have an opportunity to tell his version of the incident. He further alleges that, although the transcript of the plea indicates he signed, "I'm not innocent," he actually signed, "I am innocent."

Because a guilty or no contest plea is a waiver of certain constitutional rights, it must be a voluntary, knowing, and intelligent act "done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). The voluntariness of a plea "can be determined only by considering all of the relevant circumstances surrounding it." *Id.* at 749. Federal habeas courts cannot ignore the possibility that a

4

defendant's representations at the time of his guilty plea were the product of misunderstanding, duress, or misrepresentation by others so as to make the guilty plea a constitutionally inadequate basis for imprisonment. *Blackledge v. Allison*, 431 U.S. 63, 75 (1977).

### 1. The Plea Proceeding

Petitioner testified through an interpreter at his plea that his attorney had informed him about his constitutional rights and his right to have a trial. He claimed to have understood his attorney and to understand the trial court's explanations about jury trials, nonjury trials, the rights associated with a trial, and the penalty for the offense. He also claimed to understand that, if he entered a no contest plea, he would never get a trial and he would be giving up the constitutional rights that the court had explained to him. When asked whether he understood what he was getting into, he answered, "Yes, yes." He subsequently stated that he was pleading no contest freely and voluntarily and that no one had forced or coerced him to do anything. (Tr. Sept. 14, 2001, at 6-17.)

However, when the trial court inquired whether Petitioner was giving up his right to have a trial, Petitioner asked, "What do you mean, Your Honor, by a trial?" The trial court responded by explaining that a trial involved the rights which it had explained earlier and that witnesses would testify and a judge or a jury would decide whether Petitioner was guilty or not guilty. Petitioner then indicated that he wanted a trial. (*Id*. at 17-18.) The colloquy between Petitioner and the trial court continued as follows:

> THE COURT: So, you do not want this deal that we've talked about today?
>
> INTERPRETER [for Petitioner]: So, you're saying with a jury, or just the trial, you know, without --
>
> THE COURT: Well, here's your choice. Mr. Mengesha [defense counsel] has

arranged to have one charge dismissed, and the habitual offender status dismissed, if you will plead to one count of criminal sexual conduct in the first degree. Mr. Mengesha has arranged that deal for you.

Now, if you don't want that deal, then we will have a trial on two charges of criminal sexual conduct first degree, and the prosecutor will insist that we add the habitual offender status.

Now, you get to choose right now whether you want a trial on the two charges, or if you want to offer a no contest plea to only one charge.

INTERPRETER: I just want to go down to the one charge.

THE COURT: So, you do not want a trial, then?

INTERPRETER: Right.

THE COURT: Are you also giving up the constitutional rights that I have been telling you about today?

INTERPRETER: Yes.

THE COURT: Now, to say that you are pleading no contest, that doesn't mean you agree with the case, but it doesn't mean that you disagree with it either. And if the prosecutor gives this Court proof and the Judge decides to find you guilty, no contest means you're just going to let that happen[]. You're not going to fight it, you're not going to argue with it, you're not going to contest it. Do you understand what no contest means?

INTERPRETER: Yes, I understand.

THE COURT: How do you plead to the charge of criminal sexual conduct of the first degree?

If you want to have --

INTERPRETER: I'm not innocent, so.

THE COURT: Okay. Here's what you have to – I don't want to put the words in your mouth.

MR. MENGESHA: Judge, I would ask that the last comment be stricken from the record, if I may? His last spontaneous comment, if possible?

        THE COURT:  No unfortunately, you can't.

        MR. MENGESHA:  Okay.

        THE COURT:  Just so you understand, Mr. Pugh, if you want to take this deal then you need to say – if you want to take this deal you need to say the words no contest.

        INTERPRETER:  No contest.

        THE COURT:  If you don't want the deal, you can say let's have a trial.  So, you tell me, no contest, or let's have a trial?

        INTERPRETER:  No contest.

        MR. BLANCHARD [ the prosecutor]:  Your Honor?

        THE COURT:  Yes.

        MR. BLANCHARD:  I believe you have to ask him if it was his choice to do that[.]  I don't think that's been covered[.]

        THE COURT:  All right.  Mr. Pugh, whose choice is it for you to say no contest?

        INTERPRETER:  I decided this after hearing you, Your Honor.

(*Id*. at 18-20.)

Petitioner subsequently stipulated to using the victim's testimony at the state district court hearing as the factual basis for his plea.  The trial court accepted Petitioner's plea after concluding that it was offered freely, voluntarily, and understandably.  (*Id*. at 21, 24.)

        **2.  The Evidentiary Hearing**

At the post-conviction hearing on Petitioner's motion to withdraw his plea, Petitioner testified through an interpreter that he had been confused at his plea about the meaning of a no contest plea.  He also testified that he believed he would have an opportunity to tell the judge his side of the story and that he had not understood the trial judge would find him guilty if he

pleaded no contest. He asserted that, at the plea, the interpreter was signing and speaking, but he did not understand the lip reading or what she was saying. He claimed to have wanted a trial and to have told the judge that he did not understand the interpreter. He denied saying, "I'm not innocent" at the plea; he claimed instead that he had said, "I am innocent." (Tr. Mar. 10, 2003, at 6-7, 10-15.)

Laurinda Crossley, who was a certified sign language interpreter, testified as an expert witness for the defense. She asserted that verbs such as "is" and "am" typically are not signed and that the word "am" can be mistaken for the word "not." (*Id*. at 22.)

Emily Koss signed for Petitioner at the plea. She testified at the evidentiary hearing that she had been certified as an interpreter at the national level for twenty-five years. She did not recall Petitioner's plea, but she stated that she would have no hesitation in voicing what was signed and that she was bound by a code of ethics to notify a judge when she did not understand a deaf person's signing. (Tr. Mar. 25, 2003, at 46-49, 53-54.)

The forensic center had determined that Petitioner possessed excellent sign and language skills, and the trial court opined at the evidentiary hearing that Petitioner was not unintelligent. The court found it disingenuous for Petitioner to argue that he believed he was getting a nonjury trial by pleading no contest. The court noted that: Petitioner did not correct the court when it asked at the plea whose choice it was to say no contest; Petitioner did not complain about any mistakes when he was sentenced; and Petitioner used his own interpreter throughout most of the case. The trial court concluded that Petitioner was saying what was convenient because he did not like his sentence and wanted to get out of it. (*Id*. at 71-76.)

8

### 3. Analysis

Although Petitioner expressed some confusion at his plea about the meaning of a trial, he also indicated that he understood he had the right to a jury trial and that he could ask for a nonjury trial. He ultimately made it clear to the trial court that he did not want a trial and that he did want to plead no contest.

He claimed at the plea that he thought his attorney understood him. He also claimed that he knew what he was doing, he understood how his interpreter signed, and the interpreter was not using any signs or methods which were strange to him. His words were, "I understand the communication." (Tr. Sept. 14, 2001, at 15.)

Petitioner further indicated at the plea that, after listening to the judge explain his options of pleading no contest or going to trial, it was his choice to plead no contest. He claimed to understand his trial rights, the penalty for the charged crime, and the fact that he would not have a trial if he pleaded no contest. He agreed to waive the constitutional rights that the trial court explained to him. He also claimed to be pleading no contest freely and voluntarily.

Petitioner's simple and straightforward responses, "Yes," "Yes, I do," and "Yes, I understand" were sufficient to bind him to the consequences of his plea. *United States v. Walker*, 160 F.3d 1078, 1096 (6th Cir. 1998). Moreover, "[s]olemn declarations in open court carry a strong presumption of verity," *Blackledge v. Allison*, 431 U.S. at 74, and the trial court's factual findings, including the determination that Petitioner's testimony at the evidentiary hearing was not credible, are entitled to special deference. 28 U.S.C. § 2254(e)(1); *Patton v. Yount*, 467 U.S. 1025, 1038 (1984).

Petitioner nevertheless maintains that, although the transcript of the plea indicates that he signed, "I'm not innocent" when asked how he wanted to plead, he actually signed, "I am innocent." However, his expert witness at the evidentiary hearing, Laurinda Crossley, testified that a person who intended to say, "I am innocent" would sign "me innocent." (Tr. Mar. 10, 2003, at 22-23.) Both Crossley and Emily Koss, who signed for Petitioner at the plea, testified that the word "am" typically is not used in sign language. (*Id.*; Tr. Mar. 25, 2003, at 54-55). In light of all the expert testimony, it is not implausible that Petitioner signed, "I not innocent," as opposed to "I am innocent" at the plea. Therefore, the trial court's findings and conclusions and the state appellate court's determination that Petitioner's claim lacked merit were objectively reasonable.

### 4. Whether the Benefit of the Plea Bargain was Exaggerated

Petitioner alleges that his plea was involuntary and unintelligent because he was erroneously charged as a fourth habitual offender. He further alleges that his attorney should have challenged this error.

Petitioner argued in state court that he had two prior convictions for purposes of the habitual offender statute and, therefore, he was only a third felony offender. The bases for this argument were that (1) a South Carolina conviction for wilful injury to courthouse or jail could not be used because there is no corresponding felony in Michigan and (2) two of his South Carolina convictions arose from the same transaction.

Petitioner derived a benefit by avoiding trial and by accepting the prosecutor's offer to plead no contest, because the prosecutor dropped the habitual offender charge altogether. In addition, one count of first-degree criminal sexual conduct was dismissed. As such, the plea was

not illusory or exaggerated, and Petitioner's attorney was not ineffective for failing to challenge the alleged error. Moreover, Petitioner has failed to show that his attorney's alleged error prejudiced him. He has not alleged that, but for his attorney's error, he would have insisted on going to trial instead of pleading no contest. *Cf. Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

To conclude, the state appellate court's conclusion that Petitioner's claim about the plea lacked merit was not contrary to, or an unreasonable application of, Supreme Court precedent. Therefore, Petitioner has no right to habeas relief on the basis of his first claim.

### B. The Scoring of the Guidelines

The second and final habeas claim alleges that Petitioner was sentenced on the basis of erroneously scored guidelines in violation of his right to due process. Specifically, Petitioner contends that he was erroneously given fifty points for offense variable seven (terrorism/sadism), five points for offense variable ten (exploitation of the victim), and ten points for offense variable three (bodily injury requiring medical treatment). Petitioner alleges that there was no evidence of terrorism, sadism, or exploitation and that any injury to the victim merely supported the charge.

Petitioner's contention that the sentencing guidelines were incorrectly scored involves the trial court's interpretation of the Michigan Sentencing Guidelines. *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (Gadola, J.). The error complained of does not infringe specific federal constitutional protections and, therefore, is not cognizable under § 2254. *Id*.

Federal habeas courts may not "reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2241;

11

*Rose v. Hodges*, 423 U.S. 19, 21 (1975) (per curiam ).' *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

Petitioner purports to raise a federal constitutional issue by alleging that the scoring of the guidelines violated his right to due process. This claim would have merit if Petitioner could show that his sentence was based on "extensively and materially false" information, which he had no opportunity to correct. *Townsend v. Burke*, 334 U.S. 736, 741 (1948); *see also Roberts v. United States*, 445 U.S. 552, 556 (1980) ("We have . . . sustained due process objections to sentences imposed on the basis of 'misinformation of constitutional magnitude'") (quoting *United States v. Tucker*, 404 U.S. 443, 447 (1972)).

The trial court scored points for terrorism because Petitioner threatened to kill the victim if she called the police or told her friends about the rape. The court determined that this was separate conduct, which was designed to substantially increase the victim's fear and anxiety. (Tr. Mar. 25, 2003, at 77-78; Tr. Oct. 4, 2001, at 5-6.)

The trial court scored five points for exploitation, because Petitioner exploited his strength. Petitioner was at least 6'3" tall, and he weighed over 200 pounds, whereas the victim was a small woman, who stood about five feet tall. Petitioner allegedly picked up the victim, threw her over his shoulder, carried her into a bedroom, and pinned her hands above her head while he raped her. (Tr. Mar. 25, 2003, at 77; Tr. Oct. 4, 2001, at 6-7, 11.) As for bodily injury, the trial court relied on the victim's statements that she had suffered abdominal pains, went to the hospital, bore red marks on her wrists from being pinned down, and acquired a bacterial infection as a result of the incident. (Tr. Sept. 14, 2001, at 23; Mar. 25, 2003, at 77.)

The Court concludes that the trial court did not rely on materially false information,

which Petitioner had no opportunity to correct. Thus, Petitioner's right to due process was not violated, and he is not entitled to habeas corpus relief on the basis of his second claim.

**IV. Conclusion**

The state appellate court's determination that Petitioner's claims lacked merit did not contravene or unreasonably apply clearly established federal law as determined by the Supreme Court. Accordingly, Petitioner's application for the writ of habeas corpus [Doc. #1] is **DENIED**. The Court **DECLINES** to grant a certificate of appealability because reasonable jurists would not find the Court's assessment of Petitioner's constitutional claims debatable or wrong. *Slack v. McDaniel,* 529 U.S. 473 (2000).

        s/ Paul D. Borman
        PAUL D. BORMAN
        UNITED STATES DISTRICT JUDGE

Dated: May 13, 2005

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on May 13, 2005.

        s/Jonie Parker
        Case Manager